ROBERT LEE BENTON AND SON GIPSON V. THE STATE.

No. 11115.  Delivered November 30, 1927.

**1.—Murder—Continuance—On Account of Race Prejudice—Properly Denied.**

Where appellants, on trial for murder, requested a continuance on account of race prejudice and "mob spirit," same was properly refused. Our statute does not authorize a continuance on such grounds, although had a proper motion for a change of venue been presented and supported by proof of such fact, they may have secured a change of venue. See Art. 562, C. C. P.

**2.—Same—Special Venire—Objections To—Properly Overruled.**

Where appellants, on trial for murder, objected to the special venire because they were not present when the court made the order summoning

same, and because the names of the jurors when tendered to them were drawn from a "hat" instead of a "box," such objections were properly overruled.  See Oliver v. State, 70 Tex. Crim. Rep. 140, and other cases cited.

### 3.—Same—Summoning Venire—No Error Shown.

Where appellants objected to the special venire on their trial for murder because the constable summoned some of the veniremen, such objection was properly overruled, it appearing that none of the veniremen were absent, but were all present and available to appellants, regardless of what officer summoned them, the irregularity, if any, in securing their presence seems unavailing.  See Brown v. State, 87 Tex. Crim. Rep. 261, and other cases cited.

### 4.—Same—Evidence—Properly Excluded.

Where, on a trial for murder, there was no error in refusing to permit appellant to prove that the deceased had filed complaints in the justice court against four negroes, charging them with vagrancy, there being no connection whatever shown nor relevancy to the case on trial of such fact.

### 5.—Same—Requested Charge—Issue Not Raised—Properly Refused.

Where appellants requested the court to charge the jury that if deceased practiced "peonage" against them, and they attempted to gain their liberty from such system, this fact could be considered by the jury in mitigation of the punishment, the requested charge was properly refused, there being not the slightest evidence in the case raising such an issue.  See Note 91, Art. 658, Vernon's C. C. P. (1925), Vol. 2.

### 6.—Same—Evidence—Witness—Common Law Wife—Not Established.

Where appellant Benton objected to the evidence of a woman on the ground that she was his common law wife, and the evidence on the issue merely showed an adulterous living together, there was no error in permitting the witness to testify against him.

### 7.—Same—Evidence—Confession of One Defendant—Properly Admitted.

Where appellant Gipson, on trial jointly with his co-defendant Benton, objected to the confession of Benton when offered by the state, same was properly admitted as against Benton, and the court having instructed the jury not to consider the confession as against Gipson, no error was committed.  Gipson's acts were so interwoven with Benton's that to attempt to eliminate Gipson from the confession of Benton would have made it unintelligible.  See Smith v. State, 91 Tex. Crim. Rep. 15, and other cases cited.

### 8.—Same—Argument of Counsel—No Error Shown.

The argument of state's counsel, in which he criticised the efforts of defendant Benton in his testimony to exonerate Gipson, was a proper discussion of the evidence, both of Benton and his co-defendant Gipson, who also testified on the trial.

Appeal from the District Court of Crosby County.  Tried below before the Hon. Homer L. Pharr, Judge.

Appeal from a conviction of murder of Benton and Gipson, tried jointly, penalty assessed at death against Benton and at fifty years in the penitentiary against Gipson.

The opinion states the case.

No brief filed for appellant.

*A. A. Dawson,* State's Attorney, for the State.

HAWKINS, JUDGE.—Appellants were jointly indicted for the murder of B. E. Morgan. A joint trial resulted in the death penalty for Benton and fifty years in the penitentiary for Gipson.

Morgan had taken Benton and Gipson with other negroes from Navarro and other counties to his farm in Crosby County to pick cotton. Benton and Gipson with some negro women had left the farm owing Morgan, who followed them and returned them to the farm, where they continued work. If any unpleasantness occurred between the time they were brought back and the day of the killing the record does not reveal it. The facts of the killing are revolting. On that day Morgan went to the field where the two appellants and Lillie Tucker were at work and inquired how they were getting along. Everything appeared pleasant. After talking to them some time about the work he called Benton to one side and informed him that he (Morgan) had been told that Benton had a pistol and wanted Benton to give it up. Benton denied having it. He says Morgan took hold of him as though to search him, when he jerked loose, drew the pistol and presented it at Morgan. However that may be, when the attention of Gipson and Lillie was attracted Benton had the pistol drawn on Morgan. The two then came to where Lillie and Gipson were and Morgan told Benton if he was afraid to give the pistol to him (Morgan) to unload it and give it to either Gipson or Lillie. This Benton refused to do, but directed Morgan to march out of the field, Benton following with the pistol, and accompanied by Gipson. Morgan tried to get Benton to let Lillie go with them, but Benton ordered her to remain in the field. Morgan was made to go out of the field, across a pasture and into some rough ground or canyons. When he refused to go farther Benton shot him twice, and he and Gipson threw him into a canyon. They then went to the body and Benton took $35 from him. Thinking he was dead the two ran away, but hearing a noise looked back and discovered Morgan had gotten up and was staggering around. They went back to him, when he begged them not

to shoot him again. They took him some five hundred yards to where a ravine came into the canyon, sometimes carrying him, and sometimes he would be walking between them. After reaching the ravine they sat him down with his back against the bank and Benton shot him again. Benton fled and was arrested in Fort Worth a day or two later. Gipson returned to the field running and reported to Lillie that Benton had killed Morgan, and expressed the fear that they had been seen from a house and that he would be recognized by a red sweater he was wearing. He hid his shoes under the house and the sweater disappeared.

Appellants sought a continuance, averring in the application therefor that two brothers of deceased were leading citizens of the county and had many friends; that much publicity had been given the killing through the newspapers, it being averred that on account of appellants being negroes and charged with killing a white man the publicity had caused much race hatred against appellants. Another averment was that fear of mob violence had prompted the officers to take unusual precautions against it. It was further averred that there was no reasonable expectation that the conditions claimed to exist would be different during the "present" term of court. We are not aware of any law authorizing a continuance upon the grounds alleged in the application. If it had been for a change of venue supported by compurgators as the law requires (Art. 562, C. C. P.) it would have been the basis for receiving evidence upon that issue, but the application is sworn to only by appellants. The state controverted the application and especially the averments as to race prejudice and "mob spirit" and supported its reply by affidavits. In allowing the bill the court appends the explanation that the newspaper articles referred to were shown to have been published in Dickens County and not in Crosby County, the place of the trial, and that no proof was offered to show the existence of race prejudice or anything that would prevent appellants from securing a fair and impartial trial. Aside from the fact that the application was insufficient on its face either for a continuance or for a change of venue, the court's explanation shows beyond question that no error was committed in denying appellants' request for delay.

Appellants attacked the special venire on two grounds; first, because they were not present when the court made the order directing the summoning of the special venire. This point was decided against appellants' contention in the early days of this court. Pockett v. State, 5 Tex. Crim. App. 552; Cordova v.

State, 6 Tex. Crim. App. 207. If there has ever been an expression to the contrary it has not been called to our attention. Oliver v. State, 70 Tex. Crim. Rep. 140; Gaines v. State, 53 S. W. 623; Walker v. State, 94 Tex. Crim. Rep. 414, 251 S. W. 235. The second ground of attack upon the venire was predicated upon an averment that the names of the jurors were written on slips of paper which were placed in a "hat" and drawn therefrom, instead of being placed in and drawn from a "box," as provided in Art. 592, C. C. P. (1925). No injury is claimed to have resulted to appellants and the irregularity is not of that character which would have justified the court in setting aside the venire.

Appellants also sought to quash the venire on the ground that some of the veniremen were not summoned by the sheriff or deputy sheriff. The evidence heard upon the motion is not brought forward, but the court qualified the bill by stating that upon hearing the evidence it developed that the constable, acting under the direction of the sheriff, summoned some of the veniremen. There is no complaint that any veniremen were absent and we must assume they were present and available to appellants regardless of what officer summoned them. This being true, the irregularity, if any, in securing their presence seems unavailing. Brown v. State, 87 Tex. Crim. Rep. 261, 222 S. W. 252; Carpenter v. State, 98 Tex. Crim. Rep. 307, 265 S. W. 706.

Appellants offered in evidence certain pages from the docket of the justice of the peace which showed cases against four named negroes upon charges of vagrancy, complaints charges which had been filed by deceased. We learn from the bill that the four named parties had been convicted, paid part of the fines themselves, and the balance was paid by deceased. If we gather the import of the bill, appellants sought to impeach the judgments, averring as conclusions that said parties were not vagrants, but that deceased had instigated the prosecutions and paid part of their fines in order to improperly hold them and force them to work for him. No connection is shown between the four named parties and appellants save from a statement in the bill that appellants were working for deceased when the transactions occurred with reference to the four parties named. The bill presents no error in the ruling of the court in excluding the proffered evidence. It seems entirely irrelevant to any issue in the present case.

Appellants sought by special charge to have the jury told that if deceased had practiced "peonage" against them, and

they attempted to gain their liberty from such system, the same should be considered by the jury in mitigation of the punishment. An examination of the facts leads us to the opinion that such issue was not raised. Both of the appellants had left deceased's premises owing him. Deceased had gone after them, brought them back, and they had continued to work for him. If he used coercion in taking them back to his farm, the evidence shows they had continued to work there for several weeks with many opportunities to leave. The killing was precipitated because deceased endeavored to have Benton surrender a pistol which he was carrying. Benton resisted with the ultimate design it seems of killing and robbing deceased. Even if the issue which appellant sought to have presented had been raised the special charge requested was upon the weight of the evidence. (For authorities collated see Note 91, Art. 658, Vernon's C. C. P. (1925), Vol. 2).

It was sought to exclude the testimony of Lillie V. Tucker on the ground that she was the common law wife of appellant Benton. The objection was not tenable. Mann v. State, 44 Texas 642; Sims v. State, 30 Tex. Crim. Rep. 605; Young v. State, 92 S. W. 841; Branch's Ann. Tex. P. C., Sec. 149. The most that can be said for the evidence upon the point under consideration is that it shows the woman and Benton were living together in adultery.

Appellant Gipson objected to the confession of his co-defendant Benton when put in evidence by the state. The court overruled the objection but instructed the jury that Benton's confession was not to be considered by them against Gipson. No error was committed by the court in admitting the confession of Benton with the instruction indicated. It was, of course, admissible against Benton, and according to the confession Gipson's acts were so interwoven with Benton's that to attempt to eliminate Gipson from the confession would have rendered it incomplete, fragmentary and unintelligible. Smith v. State, 91 Tex. Crim. Rep. 15, 237 S. W. 265; Walker v. State, 88 Tex. Crim. Rep. 389, 227 S. W. 308.

Appellants complained of the following language in argument:

"The statement of Robert at Lubbock was practically identical with his statement here except those parts that refer to Son Gipson, and it would have been far better for Son if he had admitted that he went the whole way than it would have been for him to have stopped where he did, because the cir-

cumstances show he did go on and that they were both lying about it."

Appellant Benton, while testifying in his own behalf, undertook to exonerate Gipson and sought to leave the impression with the jury that what Gipson did was under Benton's direction and that Gipson abandoned the enterprise before the death of Morgan was accomplished. He states that after Morgan was shot Gipson helped him throw the body into the canyon, but as they were leaving the place and it was discovered Morgan was not dead, and when he (Benton) started back to Morgan, that Gipson ran, after which Benton claims he never saw Gipson any more. This is practically the same as Gipson's testimony given on the trial, he claiming that Benton compelled him (Gipson) to do what he did, and that he was afraid not to do so as he was bidden for fear he would be killed by Benton. Unfortunately for Gipson, the physical facts upon the ground showed that from the point where Morgan's body was thrown over the bluff the tracks of two parties appeared for a way, then the tracks of three (the one in the middle from the size and shape of the shoes appearing to be that of deceased) continued for a short distance, and then the middle tracks again disappeared and the two larger tracks were still going in the direction where the body was found. The tracks made by one of these shoes showed a cracked sole, which corresponded with Gipson's shoes found under the house where he had concealed them. These circumstances indicated that after Morgan had been shot and thrown off the bluff, but not killed outright, Gipson aided Benton in getting him to the place where the dead body was finally discovered, and justified the prosecuting attorney in the argument complained of.

Finding no error in the record, the judgment is affirmed.

*Affirmed.*