JESUS HERRERA V. THE STATE.

No. 20126.    Delivered January 25, 1939.

The opinion states the case.

*E. G. Garcia,* of San Antonio, and F. C. Canfield, of Floresville, for appellant.

*Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

GRAVES, JUDGE.—Appellant was charged by indictment with the unlawful killing of Hope Elizondo, and upon his trial was by the jury found guilty and assessed the penalty of death.

It appears from the facts that Hope Elizondo was a little Mexican girl of the age of eleven years; that she attended a

local school near La Vernia in said county, and at times was taken to such school by her father; at other times she walked, following a trail through some pastures. On the morning that she met her death she left home about 7:30 or 8 o'clock for her school duties, carrying her school books and a nickel that had been given to her by her grandfather, following this trail. On the 13th day of May, a week prior to the date Hope lost her life, the appellant had been seen in this pasture; he was also again seen in this pasture on the following day, which was Friday, and again on the Saturday following, and was seen near the hollow where the body was afterwards found, and a short distance from which the little girl's shoe was afterwards recovered. At about the same time other witnesses saw appellant on or along this pasture trail, which was afterwards the scene of the alleged crime.

When the little girl did not appear at either her school or her home a search was made for her, and in this pasture, along this trail, was found her school book and a nickel under it, and a small piece of newspaper with some blood spots thereon. There were evidence of a struggle upon the ground, and peculiar footprints in the wet sand, as well as a broken stick with blood on it was found along this trail, but the body was not found for about twenty-four hours thereafter, at which time the body had turned blue, one eye was bloody, and the body was badly decomposed, and her underclothes and one of her shoes were missing. There was an abandoned house near and the officers in their search found a place on such house from which it appeared the broken stick or plank had been taken, and there found the other portion of such plank. They also found some peculiar tracks in the wet sand along this trail and close to where the body was found, and after finding some shoes at appellant's home, they claimed that these shoes fitted these peculiar tracks. They also soon found the panties, later identified as the little girl's, dirty and torn, on the line of these tracks.

The appellant was arrested, and we find in the statement of facts the following statement purportedly made and signed by him:

"CITY OF SAN ANTONIO POLICE DEPARTMENT
"Voluntary statement of: "File No. 2361——Cs of Stt
"Rape and Murder
"PHR

"I, Jesus Herrera being first duly warned by Sergeant P. H. Holleron the person to whom this statement is made to the effect:

"First: That I do not have to make any statement at all.

"Second: That any statement made by me may and will be used in evidence against me in the trial of the case concerning which this confession or statement is made, do hereby voluntary state as follows:

"My name is Jesus Herrera. I am about 48 years old. I am a married man. I live with my wife at Lavernia, Texas .. Wilson County . . . I do farm work.

"On last Friday morning, May 20th, A. D. 1938 at about 6:00 a m I left my home and I walked past an abandoned house, about 300 or 400 yards from my house and there, from this house, I tore off a board, part of the house siding and I broke this board in half, and I left one half of this board by this abandoned house . . . then, taking the one half of the board with me, I crossed a creek and on across a field, about one and a quarter miles, then I walked across the St Hedwig road and into a pasture where there was a trail and I knew that on this trail, I knew that every school day morning and evening, a young girl daughter of Pablo Elizando a farmer, would and did come along this trail going to and from school so, then I hid myself at about 6:30 a m. that same morning, May 20th A D 1938 alongside of this trail and while I was waiting behind a tree and I judge that I was there in hiding when this girl, I now understand her name was Hope Elizondo came walking down this trail by herself . . . . Just after this girl, Hope Elizondo passed me, I walked out and behind the girl and as I was walking behind this girl, I asked her where she was going and she replied that she was going to school . . all this time, I held this half a board in my right hand . . . I followed this girl closely for about two or three hundred yards then, I asked this girl to go over in the pasture with me and the girl replied that she was now in the pasture then, I grabbed ahold of this girl . . . . I had thrown the piece of board that I did have away . . by her left forearm—she dropped her books then I grabbed this girl, with my left hand by her throat and I then threw her down onto the ground and I then, with one hand, left hand, I did choke this girl to death by her throat until she was dead . . . This girl did not scream or struggle much, this was right on the trail that I did choke her and after this girl, Hope Elizondo was dead, I then did pull up her dress then I did tear this girls underclothes off of her and then, I did ravish this girl who was dead . . I did insert my penus into the privates of this dead girl and I did satisfy my desire in raping this girl who was dead . . . and after I did this once, sexual intercourse with this dead girl, I then picked up the dead body of this girl and I carried the body about 150 yards into the brush where I then threw

down the body and then took the little panties of this dead girl along with me and walking back in the pasture, over the same way that I had previously come, I then hid the little panties of the dead girl in the brush then, I trotted and ran back across the road the reverse of the same way that I had entered this place and I then went to my house . . . I was dressed in a blue shirt, patched, gray work trousers covered with patches, and a part of tan work shoes, one heel was off one shoe and the soles of both shoes at the ball of the foot were badly worn and these shoes left peculiar markings wherever I walked . . . . I did not wear any hat . . . When I threw the girl down first, one of her shoes came off and I picked up this shoe and threw this one shoe into the brush about six feet from the trail. This girl, Hope Elizondo was wearing a red color dress and no hat . . . At about 3.30 am Sunday morning May 21st AD 1938 officers came to my house and searched my house for clothes and blood stains but not finding any such things, the officers went away and left me at my house . . . On Saturday, May 21st, A D 1938 at about twelve noon, officers came to my house but I was not there but I was nearby and shortly I heard the howls of dogs and shortly the dogs came up to the house of Grabiel Bezera where I was hiding and then I came out of this house with my hands up and surrendered myself to the officers . . . . . . I did not admit to the officers that I was the one that they were looking for as I had heard that the officers had found the body of the dead girl, Hope Elizondo about 12 years old, where I had thrown the body in the brush . . . and as I knew that I was the guilty person of this crime, as I had choked the girl to death and then I did ravish the body of this dead girl, as herein stated, I felt that it would not be long before I would be placed in jail and today, May 23rd AD 1938, at about 4.00 p m at Detective Headquarters in San Antonio, Texas, I did admit to Detectives Ruhnke and Robinson that I had done this cruel job of murder and rape and I then opened up and explained to the officers just as I have stated herein . . . . Today, May 23rd A D 1938 while I was making this confession to Sergeant Holleron, I did identify the dirty panties of the dead girl, Hope Elizondo as being the same panties that I had taken off this girls body. . . . I wish to further state that any fingerprints found on the piece of board are my finger prints and the shoe markings in the dirt on the trail are the markings of my shoes as herein stated. . . . This is all I know * * * . This as stated in this my confession all did happen in the County of Wilson in the vicinity of Lavernia in the State of Texas. . . . I have willingly given this statement to Sergeant Halleron this 23rd day of May A. D.

1938 after I was duly warned of my rights and I was assisted in answering questions and etc by Detective Joe Ruhnke and Sheriff Boothe who acted as my interpreter and as I do not read any English, Detective Joe Ruhnke has read this over to me and I find that this statement is as I have stated. . . . This at about 5.40 p m this 23rd day of May A D 1938.

"(Signed)    Jesus Herrera.

"Witnesses to signature of statement
"Gale Grahan (Evening News)    David Bennett."

The facts appear to be abundant to show that this appellant, actuated by his ungovernable lust, took the life of this little girl, and after he had strangled and choked her to death, some one had undoubtedly outraged the body. Dr. R. G. Martin in his lucid testimony showed to the jury that the child's body, after her death by strangulation, had been violated, her hymen ruptured and her vagina left open. He testified that she "was small for her age. I think she was a very dainty looking child, but not weak looking. She was slim, probably just a little underweight. At that age, I wouldn't think she had developed into womanhood. In my opinion, death of the little girl I examined that day was caused by asphyxiation. I think her last spirit of life was snuffed out by suffocation or strangulation."

Appellant filed a motion for a change of venue, supported alone by his own affidavit taken before his counsel. There is not attached thereto the affidavit of any compurgators, and no reason stated why such affidavits are not presented.

Art. 562, C. C. P. provides as follows:

"A change of venue may be granted on the written application of the defendant, supported by his own affidavit and the affidavit of at least two credible persons, residents of the county where the prosecution is instituted, for either of the following causes, the truth and sufficiency of which the court shall determine:

"1. That there exists in the county where the prosecution is commenced so great a prejudice against him that he can not obtain a fair and impartial trial.

"2. That there is a dangerous combination against him instigated by influential persons, by reason of which he cannot expect a fair trial."

It is evident from his motion that the first grounds set forth in the above article were relied upon to justify the filing of such motion. The motion should have been accompanied by such affidavits, and the court was correct in overruling such motion.

In the case of Hassell v. State, 298 S. W. Rep. 293, Judge Lattimore said: "An attempt was made to present an application for a change of venue, but as same appears in the record it is sworn to only by the appellant and supported by an affidavit made by the attorney appointed to represent him. Article 562, 1925, C. C. P. sets out the only character of application for a change of venue which is deemed legal. Its provisions are plain. The statute was not complied with in the instant case. The authorities hold an application not in compliance with the statute to be fatally defective. O'Neal v. State, 14 Tex. App. 582; Macklin v. State, 53 Tex. Cr. R. 197, 109 S. W. 145; Gibson v. State, 53 Tex. Cr. R. 349, 110 S. W. 41. It is stated that the statutory requirement that the application be supported by the affidavits of at least two credible persons, residents of the county, is not met by the affidavits of the accused and one other person. This court has also held that an affidavit for change of venue, sworn to by the attorney for the accused, could not be considered. Luttrell v. State, 70 Tex. Cr. R. 183, 157 S. W. 157." Also see Ashton v. State, 48 S. W. (2d) 293; McKenzie v. State, 11 S. W. (2d) 172; Benton v. State, 300 S. W. Rep. 75.

This disposes of the only question properly before this court, but we have carefully gone over the entire record. We find that appellant denied the statement admitted in evidence, and finally said that the contents thereof were unknown to him. That he did not understand what he was doing, and that the officers themselves were the ones that said all the things placed therein. This matter was properly charged upon by the careful trial judge, and the jury instructed to disregard such statement unless the same was voluntarily made under a proper warning as provided by the statute.

It further appears from the facts that those who searched for the child's body, when they found the same one of the shoes was missing from her foot, and they were unable to find such shoe. After the defendant had made the above quoted statement, a search was made for the missing shoe at the point mentioned in such statement and it was there found.

It has long been the rule in Texas, which is a statutory modification of the common law, that where a defendant either in an oral or written confession makes a statement of facts or circumstances not then known, which conduce to establish his guilt, such as the finding of secreted or stolen property, or the instrument with which he states the offense was committed, such statements are admissible in evidence regardless of whether or not a proper warning had been given. See Art. 727, C. C. P.

Vernon's Tex. Ann. Statutes, and cases there cited; also Greer v. State, 116 Texas Crim. Rep. 491.

While this alleged crime was such as to have caused right-thinking people to contemplate the same with horror, and be calculated to arouse the passions of men, nevertheless this record comes to us singularly free from such indications, and this difficult trial impresses us as being remarkably free from disturbing errors. The appellant's rights were guarded throughout the whole proceedings, and believing that the facts are sufficient to support the jury's verdict, this judgment is affirmed.